UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v-

DONALD ANDREWS,

          Supervisee.

No. 11-cr-923 (RJS)
ORDER

RICHARD J. SULLIVAN, Circuit Judge:

On July 19, 2024, the United States Probation Office ("Probation") submitted a report alleging that Supervisee Donald Andrews engaged in six specified violations of the terms of his supervised release (the "VOSR Report"). On December 5, 2024, Andrews admitted to three of the specifications, and the Court held an evidentiary hearing as to the others. For the reasons set forth below, the Court accepts Andrews's admissions to Specifications 4, 5, and 6 and finds that the government failed to meet its burden of proof with respect to Specifications 1, 2, and 3.

**I.   Background**

In 2003, Andrews pleaded guilty in the District of Maine to one count of conspiracy to distribute more than 50 grams of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(a), and one count of possession with intent to distribute more than 50 grams of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(a). (Doc. No. 2 at 1.) The district court (Woodcock, Jr., *J.*) sentenced Andrews to 151 months' imprisonment followed by a five-year term of supervised release; the district court later reduced Andrews's term of imprisonment to 121 months after the United States Sentencing Commission retroactively lowered his applicable guideline range pursuant to 28 U.S.C. § 994(u). (*Id.* at 7.) On December 23, 2010, Andrews commenced his term of supervised release, and on October 31, 2011, his supervision was transferred to this district. (*See* Doc. No. 1; Doc. No. 20.)

On June 25, 2015, Probation submitted a report alleging that Andrews had violated the terms of his supervised release in connection with a domestic violence incident between Andrews and his girlfriend. The Court ultimately found that Andrews had violated two of the three alleged specifications and sentenced Andrews to one month incarceration followed by thirteen months of supervised release. (*See* Doc. No. 22 at 1–3.)

On October 31, 2016, Probation filed a second violation report, alleging that Andrews slashed Edward Jones across the face with a sharp instrument. After having an evidentiary hearing at which Jones testified and the government presented video footage of the incident, the Court found by a preponderance of the evidence that Andrews committed the slashing. (*See* Doc. No. 41 at 1.) The Court then sentenced Andrews to forty-six months' imprisonment to be followed by five years of supervised release. (*Id.* at 2–3.)

Andrews's current term of supervised release began on October 2, 2020. As part of his conditions of supervised release, Andrews is not permitted to communicate or interact with a convicted felon or possess a firearm. (*See id.* at 4 ("If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.").)

On June 20, 2024, Andrews was arrested on state charges stemming from a March 6, 2024 incident in which he again encountered Jones. Probation subsequently filed the current violation report, alleging that Andrews (1) menaced Jones in the second degree in violation of New York Penal Law § 120.14 (Specification 1); (2) menaced Jones in the third degree in violation of New York Penal Law § 120.15 (Specification 2); (3) harassed Jones in the second degree in violation of New York Penal Law § 240.26 (Specification 3); (4) associated with Jones, who was a convicted felon (Specification 4); (5) used a controlled substance, to wit, marijuana (Specification 5); and (6) failed to notify Probation of a change in his residence (Specification 6). On August 2, 2024, Andrews

denied all six specifications, and the Court scheduled an evidentiary hearing for December 5, 2024. (Doc. No. 64 at 12–14; Doc. No. 61.) Prior to the hearing, the government filed a motion *in limine* seeking to introduce out-of-court statements made by Jones to law enforcement officers in light of the government's inability to locate Jones. (*See* Doc. No. 58.) Andrews opposed the motion. (*See* Doc. No. 60.) The Court reserved decision on the motion until after the evidentiary hearing. (Doc. No. 61.)

Immediately prior to the hearing, Andrews admitted to Specifications 4, 5, and 6. (*See* Doc. No. 67 at 5, 8–9.) Although the Court accepted Andrews's admissions to Specifications 5 and 6, it reserved decision as to whether Andrews's admitted conduct constituted a violation of Specification 4. (*Id.* at 9.) The Court then proceeded with the evidentiary hearing as to Specifications 1, 2, and 3.

## II. Evidentiary Hearing

During the course of the hearing, the government introduced testimony from two New York City Police officers ("Detective Samuel" and "Detective Franzitta") as well as several exhibits, including an audio recording (GX 1) and documents (GX 2) related to Jones's identification of Andrews at the police station; video footage of Andrews's post-arrest statement given to another New York City Police officer ("Detective Young") on June 20, 2024 (GX 3); a transcript of Jones's 2017 testimony against Andrews's related to the prior violation of supervised release in which Andrews slashed Jones in the face (GX 4); and audio recordings of two calls placed by Jones to the Federal Bureau of Investigation ("FBI") on March 6, 2024 (GX 5) and May 10, 2024 (GX 6). Andrews also introduced the transcript of his 2017 sentencing proceeding and police reports related to the incident on March 6, 2024. (*See* Doc. No. 67 at 13–16.)

Detective Samuel testified about his interaction with Jones when Jones filed the underlying complaint against Andrews on March 7, 2024. (*See* Doc. No. 67 at 17–36.) According to Detective Samuel, Jones walked into the 25th Precinct in East Harlem and alleged that Andrews had approached

him as he was walking on the sidewalk, asked him what he was going to do now that "the Feds ain't here," and brandished a firearm. (*See* Doc. No. 67 at 19–21.) Jones said that he asked Andrews if he was going to shoot him in broad daylight, acknowledged that they were both on parole, commented that shooting him would be stupid, and then fled the scene. (*See id.*)

The government's second witness, Detective Franzitta, provided testimony about his interaction with Jones as he administered a double-blind photo-array procedure that resulted in Jones's identification of Andrews as the person who had threatened him. (*See* Doc. No. 67 at 36–53.) After authenticating the audio recording of Jones's identification (GX 1) and the photo array signed by Jones (GX 2), Detective Franzitta described Jones as "a little bit crazy" and "just a level down from irate." (Doc. No. 67 at 41–44, 47.)

The government also played two audio recordings of phone calls that Jones placed to the FBI. (*See* Doc. No. 67 at 53–54.) The first recording, which was made on March 6, 2024, mainly consisted of Jones identifying himself to an FBI operator who seemed unable to hear him before the call was disconnected. (GX 5.) In the second recording, which took place on May 10, 2024, Jones reported that Andrews had "pulled out a gun on [him], told [him that he] wasn't in federal court right now [and that] the judge wasn't here to save [him], and chased [him] with a gun." (GX 6 at 1:38–2:16.)

The government also introduced video footage of Andrews's post-arrest statements to Detective Young. (*See* GX 3.) At the beginning of the video, Andrews asserted that he did not know who had filed a complaint against him relating to a verbal "altercation" in March. (*See id.* at 3:31–41.) After Detective Young elaborated that "[t]here was a complaint made that you approach[ed] an individual on the sidewalk, [and] you lifted up your shirt and showed a firearm," Andrews immediately identified Jones as the likely complainant. (*Id.* at 4:17–25.) Andrews explained that Jones was the only person he could think of who would make such an accusation, and noted that he had been warned by a friend that Jones was "trying to get you locked back up" and that that friend's

4

mother had heard from Jones himself that Jones intended to harm Andrews.  (*See id.* at 5:36–6:49.)  Andrews also made the point that it would be foolish for him to brandish a gun because the penalty for brandishing a firearm was nearly as high as the penalty for firing one.  (*See id.* at 8:24–9:55.)

Andrews ultimately chose not to testify and introduced no evidence besides the transcript from his prior violation of supervised-release sentencing and the police reports related to the incident on March 6, 2024.  (*See* Doc. No. 67 at 13, 16.)  At the close of the evidence, the Court directed the parties to make post-hearing submissions.  (*See id.* at 76.)

### III. Discussion

#### a. Legal Standard

"The court may . . . revoke a term of supervised release . . . if the court . . . finds by a preponderance of the evidence that the defendant violated a condition of supervised release."  18 U.S.C. § 3583(e)(3).  The preponderance-of-the-evidence standard "requires proof that the defendant's violation of supervision was more likely than not."  *United States v. Edwards*, 834 F.3d 180, 199 (2d Cir. 2016) (internal quotation marks omitted).

Since revocation proceedings are not "part of a criminal prosecution, . . . defendants in such proceedings are not entitled to the full panoply of rights that criminal defendants generally enjoy." *United States v. Carthen*, 681 F.3d 94, 99 (2d Cir. 2012) (internal quotation marks omitted).  For example, the Federal Rules of Evidence do not apply to revocation hearings, and hearsay is generally admissible.  See Fed. R. Evid. 1101(d)(3); *United States v. Jones*, 299 F.3d 103, 110 (2d Cir. 2002). The Confrontation Clause of the Sixth Amendment also "does not apply to supervised-release revocation hearings." *United States v. Williams*, 443 F.3d 35, 45 (2d Cir. 2006).  Rather, a supervisee in a revocation proceeding is afforded protection that "takes the form of a collection of due process rights," *United States v. Sanchez*, 225 F.3d 172, 175 (2d Cir. 2000), which are set forth in Federal Rule of Criminal Procedure 32.1(b), *see* 18 U.S.C. § 3583(e)(3) (providing that "the Federal Rules of

5

Criminal Procedure applicable to revocation of probation and supervised release" apply to revocation proceedings).

Accordingly, a district court may consider the out-of-court statements of an adverse witness if "the [C]ourt determines that the interest of justice does not require the witness to appear." Fed. R. Crim. P. 32.1(b)(2)(C). In making such a determination, the Court must balance "the defendant's interest in confronting the declarant" against "the government's reasons for not producing the witness and the reliability of the proffered hearsay." *Williams*, 443 F.3d at 45.

### b. Specifications 1, 2, and 3

Even assuming that "the interest of justice" did not require Jones to appear, the Court finds that the government has failed to show by a preponderance of the evidence that Andrews violated Specifications 1, 2, or 3. While the evidence – including Andrews's admission to Specification 4 – establishes that Andrews and Jones interacted with each other for some period of time on March 6, 2024, the Court cannot say that it "was more likely than not" that Andrews actually possessed a firearm or even threatened to physically harm Jones. *United States v. Doka*, 955 F.3d 290, 293 (2d Cir. 2020).

Jones's calls to the FBI, his rendition of events to Detective Samuel, and his subsequent identification of Andrews in the photo array administered by Detective Franzitta – without more – do not outweigh Andrews's denial of possessing a gun or threatening Jones. As the Court noted at the evidentiary hearing, Jones sounded frenetic in his calls to the FBI (Doc. No. 67 at 62), and when Jones filed the report on March 7, 2025, even Detective Franzitta described him as being "a little bit crazy" (*Id.* at 47). That the Court credited Jones's testimony at the 2017 hearing does not compel a finding of credibility here. Indeed, even at the 2017 hearing, the Court noted that Jones "was a very erratic witness and sometimes very emotional." (*See* Doc. No. 38 at 70.) It was only because other evidence – including video footage of the incident – corroborated Jones's testimony that the Court credited

Jones's allegations and concluded that Andrews had in fact slashed Jones. (*See id.*) In 2024, by contrast, there was no video footage depicting the incident and no live testimony from Jones, who could not be cross-examined or questioned by the Court about the statements he made to the police at the precinct. Jones's identification of Andrews is of no particular significance, since the two men obviously knew each other. The mere fact that Jones picked Andrews out of a lineup does not corroborate his version of what transpired when the two men met on March 6, 2024. Without more, the Court cannot find that Andrews threatened Jones or brandished a firearm.

In its post-hearing submission, the government argues that Jones's story has "a ring of truth" because it includes allegations that refer back to past events between Jones and Andrews, including Jones's 2017 slashing. (*See* Doc. No. 66 at 13 ("What are you going to do now, the Feds ain't here").) But the fact that Andrews slashed Jones in 2017 is not in dispute; nor is the fact that the two men met on March 6, 2024. The sole dispute concerns what occurred during that meeting, which is unresolvable on this scant record. Put simply, Andrews's post-arrest statements to the detectives are just as plausible as Jones's – or more so given the absence of Jones and the erratic quality of his statements to the detectives. According to Andrews, he approached Jones to clear the air because he had slashed Jones back in 2017 and now heard that Jones wanted to physically harm him. (*See* GX 3 at 5:25–6:18.) Andrews insisted that he merely let Jones know that he wanted no quarrel with him (*see id.* at 5:58–6:18), and he vehemently denied that he had possessed or brandished a firearm (*see id.* 8:25–9:48). Significantly, the government produced no evidence corroborating Jones's allegation that Andrews possessed a firearm in March 2024. No other witness testified to that fact, and no firearm was ever recovered from Andrews.

Although Jones's allegations against Andrews are troubling, and not wholly implausible given Andrews's prior violent conduct against Jones, the Court's inability to question Jones and assess his credibility undermined the reliability of Jones's statements to law enforcement officers. The Court

therefore concludes that the government has failed to meet its burden with respect to Specifications 1, 2, and 3 of the VOSR report. *See Doka*, 955 F.3d at 293.

### c. Specification 4

The Court reserved decision as to whether to accept Andrews's admission to Specification 4, which alleges that Andrews "associated with a convicted felon" when he met with Edward Jones on March 6, 2024. (VOSR Report at 4.) Standard Condition 8 of Andrews's terms of supervised release provides that Andrews "must not knowingly communicate or interact with" someone who has "been convicted of a felony." (Doc. No. 41 at 4.) Andrews concedes that he engaged in a two-to-three-minute, face-to-face conversation with Jones, whom he knew was a convicted felon. (Doc. No. 67 at 5–6.) The only wrinkle is that Andrews also stated that he did not plan on encountering Jones at the time of the meeting. (*See id.* at 5.) But while there is reason to doubt that a purely accidental encounter could constitute a "knowing[] communicat[ion] or interact[ion] with" a convicted felon, Andrews's own statements reflect that the meeting, which may have begun as an unplanned occurrence, blossomed into a knowing exchange when Andrews crossed the street to speak with Jones. Indeed, Andrews himself admits that he could have just walked to the other side of the street or avoided Jones altogether. (*Id.* at 5–6.) Instead, Andrews admitted that he conferred with Jones for "[a]bout three minutes," all the while knowing that Jones was a convicted felon. (*Id.* at 6.) Based on these undisputed facts, the Court finds – and Andrews does not dispute – that Andrews violated Standard Condition 8 of his terms of supervised release as set forth in Specification 4 of the VOSR Report.

Accordingly, IT IS HEREBY ORDERED THAT that Andrews shall appear for sentencing as to Specifications 4, 5, and 6 on June 6, 2025 at 10:00 a.m., in Courtroom 21C of the Daniel Patrick Moynihan Courthouse, 500 Pearl Street, New York, NY 10007. Andrews shall submit his sentencing

submission by May 23, 2025, and the government shall submit its sentencing submission by May 30, 2025.

The Clerk of Court is respectfully directed to terminate the motion pending at Doc. No. 58.

SO ORDERED.

Dated:     May 16, 2025
           New York, New York

_____
RICHARD J. SULLIVAN
UNITED STATES CIRCUIT JUDGE
Sitting by Designation